New Friendship Used Clothing Collection, LLC v. Katz, 2017 NCBC 71.

| | |
|---|---|
| STATE OF NORTH CAROLINA | IN THE GENERAL COURT OF JUSTICE |
| | SUPERIOR COURT DIVISION |
| WAKE COUNTY | 16 CVS 14819 |

NEW FRIENDSHIP USED
CLOTHING COLLECTION, LLC;
AD&D PARTNERS, LLC; DANIEL P.
GREEN; ALEX HUSTED; and DAVID
J.R. MILLINER,

              Plaintiffs,

v.

NORMAN "NIR" KATZ; DAVID R.
GREENFIELD; and FRIENDSHIP
USED CLOTHING COLLECTION,
LLC,

              Defendants.

**ORDER AND OPINION ON
DEFENDANTS' MOTIONS TO
DISMISS**

1. **THIS MATTER** is before the Court on Defendant Norman "Nir" Katz's ("Katz") partial motion to dismiss ("Katz's Motion") and Defendants David R. Greenfield ("Greenfield") and Friendship Used Clothing Collection, LLC's ("Friendship") motion to dismiss ("Greenfield and Friendship's Motion") (collectively, the "Motions"). Having considered the Motions, the briefs, and the arguments of counsel at a hearing on the Motions, the Court **DENIES** Katz's Motion and **GRANTS in part** and **DENIES in part** Greenfield and Friendship's Motion.

> *Robinson, Bradshaw & Hinson, P.A., by Julian H. Wright, Jr. and Erik R. Zimmerman, for Plaintiffs.*

> *Glenn, Mills, Fisher & Mahoney, P.A., by Carlos E. Mahoney, for Defendant Norman "Nir" Katz.*

*Jordan Price Wall Gray Jones & Carlton, PLLC, by Lori P. Jones, for Defendants David R. Greenfield and Friendship Used Clothing Collection, LLC.*

Robinson, Judge.

## I. PROCEDURAL HISTORY

2. The Court sets forth here only those portions of the procedural history relevant to its determination of the Motions.

3. Plaintiffs New Friendship Used Clothing Collection, LLC ("New Friendship"), AD&D Partners, LLC ("AD&D"), Daniel P. Green ("Green"), Alex Husted ("Husted"), and David J.R. Milliner ("Milliner") (collectively, the "Plaintiffs") filed their Verified Complaint on December 2, 2016 and their Verified First Amended Complaint (the "Amended Complaint") on March 20, 2017.

4. This action was designated as a mandatory complex business case by order of the Chief Justice of the Supreme Court of North Carolina dated December 5, 2016 and assigned to the undersigned by order of Chief Business Court Judge James L. Gale dated December 6, 2016.

5. On April 21, 2017, Katz filed his answer to the Amended Complaint ("Katz's Answer").

6. On April 24, 2017, Katz filed his motion to dismiss pursuant to Rule 12(b)(6) of the North Carolina Rules of Civil Procedure ("Rule(s)").

7. On May 8, 2017, Greenfield and Friendship filed their motion to dismiss pursuant to Rule 12(b)(6).

8.     The Motions have been fully briefed, and the Court held a hearing on the Motions on July 19, 2017.  The Motions are now ripe for resolution.

## II.     FACTUAL BACKGROUND

### A.     The Parties

9.     New Friendship is a North Carolina limited liability company with its registered office in Wake County, North Carolina.  (Am. Compl. ¶ 6, ECF No. 21.)

10.     AD&D is a New Jersey limited liability company with its principal place of business in Cherry Hill, New Jersey.  (ECF No. 21 at ¶ 7.)  Green, Husted, and Milliner are equal members of AD&D.  (ECF No. 21 at ¶ 17.)  AD&D, Green, Husted, and Milliner are collectively referred to herein as the "AD&D Plaintiffs."

11.     Friendship is a North Carolina limited liability company with its registered and principal office in Wake County, North Carolina.  (ECF No. 21 at ¶ 13.)  Susan Greenfield, who is not a party to this action, is Greenfield's wife and the sole member and manager of Friendship.  (ECF No. 21 at ¶ 36.)  Plaintiffs allege that Greenfield operates Friendship and is effectively its manager.  (ECF No. 21 at ¶¶ 38–39.)

### B.     AD&D Plaintiffs and Katz Enter into a Joint Venture

12.     Used clothing wholesalers place containers or donation bins in shopping center parking lots, periodically collect their contents, and then transport the contents to a warehouse where the contents are sold to domestic or overseas sorting facilities and retailers.  (ECF No. 21 at ¶ 19.)  The wholesale trade of used clothing is estimated to be a $3 billion industry.  (ECF No. 21 at ¶ 20.)  Green, Husted, and

Milliner sought to join this industry by identifying and acquiring existing used clothing businesses. (ECF No. 21 at ¶ 21.)

13. In December 2015, Green, Husted, and Milliner formed AD&D for the purpose of exploring business opportunities in the wholesale used clothing industry. (ECF No. 21 at ¶ 18.) For this purpose, Green, Husted, and Milliner had developed financial models to evaluate potential acquisitions of used clothing businesses by using company data and subjecting it to varied sensitivity assumptions and statistical modeling in order to justify a valuation, forecast performance, and obtain financing. (ECF No. 21 at ¶ 22.)

14. In February 2016, AD&D Plaintiffs attended the annual Secondary Materials and Recycled Textiles ("SMART") conference in Florida to explore potential business opportunities. (ECF No. 21 at ¶¶ 26–27.) At that time, Katz was chairman of SMART's Bin Committee. (ECF No. 21 at ¶ 29.) Although AD&D Plaintiffs had previously spoken with Katz on a conference call, AD&D Plaintiffs first met Katz in person at the SMART conference. (ECF No. 21 at ¶ 30.) Katz's family has been in the used clothing business for decades, operating over 2,000 collection bins in more than six states. (ECF No. 21 at ¶ 28.)

15. After the SMART conference, Katz expressed to AD&D Plaintiffs his interest in consolidating the wholesale used clothing industry. (ECF No. 21 at ¶ 31.) After hearing about AD&D Plaintiffs' goals and the financial models they had developed, Katz sought to establish a business bond with AD&D Plaintiffs. (ECF No. 21 at ¶ 32.) Soon thereafter, AD&D Plaintiffs and Katz were working together to

identify and jointly acquire suitable businesses.  (ECF No. 21 at ¶ 33.)  Due to their joint efforts, AD&D Plaintiffs shared their financial models with Katz and provided Katz with full access to their password-protected, shared computer drive containing all proprietary work files in connection with each proposed acquisition.  (ECF No. 21 at ¶¶ 34, 50.)

**C.    AD&D Plaintiffs and Katz Pursue Acquisition of Friendship**

16.    Katz identified and brought Friendship to AD&D Plaintiffs' attention. (ECF No. 21 at ¶ 35.)   Plaintiffs allege that Katz had previously spoken with Greenfield about purchasing Friendship, but that Katz had been unable to do so without AD&D Plaintiffs' financial models.  (ECF No. 21 at ¶¶ 42−43.)

17.    In June 2016, AD&D Plaintiffs and Katz negotiated with Greenfield about a possible acquisition of Friendship while simultaneously exploring other opportunities in various states.  (ECF No. 21 at ¶¶ 44−45.)  At this time, AD&D Plaintiffs, Katz, and Greenfield entered into nondisclosure agreements regarding their negotiations over the acquisition of Friendship.  (ECF No. 21 at ¶ 47.)

18.    In August 2016, AD&D Plaintiffs and Katz traveled to North Carolina and met with Greenfield to discuss the acquisition of Friendship.  (ECF No. 21 at ¶ 48.)

19.    On August 18, 2016, Green e-mailed Greenfield a proposal under which AD&D Plaintiffs and Katz would purchase Friendship.  (ECF No. 21 at ¶ 53.)  Under the proposal, the purchase price was to be partially financed by a note.  (ECF No. 21 at ¶ 53.)

20.     On August 19, 2016, Green and Greenfield discussed the proposal by telephone.  (ECF No. 21 at ¶ 54.)  Later that same day, Green e-mailed another proposal to Greenfield that stated a higher purchase price, which was still to be partially financed by a note.  (ECF No. 21 at ¶ 55.)  Greenfield responded by e-mail stating "[e]verything seems [to] be acceptable.  I would like to sleep on it tonight and make sure this is the right move for me and my wife.  Let's plan on getting the ball rolling on Monday morning."  (ECF No. 21 at ¶ 56 (second alteration in original).)

21.     On August 22, 2016, Greenfield called Green stating that he agreed to the terms of the August 19 proposal.  (ECF No. 21 at ¶ 57.)  Thereafter, Green e-mailed Husted, Milliner, and Katz stating "[Greenfield] called, some detail questions but he's happy and we have a deal!"  (ECF No. 21 at ¶ 58.)  That same day, Greenfield again called Green to confirm the deal, and they agreed to negotiate the acquisition terms that remained open.  (ECF No. 21 at ¶ 59.)  Greenfield told Green that he wanted to close the acquisition by September 30, 2016.  (ECF No. 21 at ¶ 59.)  Green agreed that AD&D Plaintiffs and Katz would aim to close the acquisition by that date.  (ECF No. 21 at ¶ 59.)

22.     AD&D Plaintiffs' counsel drafted an Asset Purchase Agreement ("APA") for the acquisition of Friendship.  (ECF No. 21 at ¶ 60.)  Plaintiffs allege that "[t]he [APA] provides a blueprint for the acquisition of a used clothing business and incorporates confidential and proprietary strategies that the AD&D Plaintiffs have developed over time for acquiring such businesses, which are not generally known to others."  (ECF No. 21 at ¶ 67.)

23.     On September 1, 2016, AD&D Plaintiffs' counsel e-mailed a draft APA to Greenfield's counsel for AD&D Plaintiffs and Katz's purchase of Friendship, and Green e-mailed a copy of the draft to Greenfield.  (ECF No. 21 at ¶ 61.)  Plaintiffs allege that the draft APA contained all the material terms of the acquisition and provided for a closing date of September 30, 2016.  (ECF No. 21 at ¶ 62.)

24.     From September 1, 2016 through September 19, 2016, the parties negotiated the APA, and AD&D Plaintiffs and their counsel created revised versions of the APA and sent them to Greenfield.  (ECF No. 21 at ¶ 63.)  During this time, Greenfield repeatedly stated that he expected to complete the deal with AD&D Plaintiffs and Katz and close by September 30, 2016.  (ECF No. 21 at ¶ 64.)

25.     During their negotiations with Greenfield, Green, Husted, Milliner, and Katz formed New Friendship for the sole purpose of acquiring Friendship.  (ECF No. 21 at ¶ 72.)  On September 12, 2016, New Friendship's Articles of Organization were filed, identifying Green, Husted, Milliner, and Katz as New Friendship's members.  (ECF No. 21 at ¶¶ 74−75.)

26.     Plaintiffs allege that, in August and September 2016, Green, Husted, Milliner, and Katz discussed the terms of a potential operating agreement for New Friendship and exchanged drafts thereof.  (ECF No. 21 at ¶ 76.)  In the midst of these discussions, on September 19, 2016, Green e-mailed Katz stating that Green, Husted, and Milliner did not think further economic changes to the draft operating agreement in Katz's favor were warranted.  (ECF No. 21 at ¶ 89.)  An operating agreement was never executed.  (ECF No. 21 at ¶ 77.)

### D.   Katz Pursues Acquisition of Friendship

27.   On or before September 20, 2016, Katz called Greenfield, and Greenfield suggested that Katz purchase Friendship for himself.  (ECF No. 21 at ¶ 90.)

28.   On September 20, 2016, Katz e-mailed Greenfield a draft term sheet proposing that a company controlled by Katz, K4 Ventures Inc. ("K4"), acquire Friendship.  (ECF No. 21 at ¶ 93.)  That same day, Greenfield forwarded Katz's e-mail to Susan Greenfield.  (ECF No. 21 at ¶ 94.)

29.   On September 21, 2016, Katz responded to Green's September 19 e-mail stating, in part, "I was deeply disappointed by your note.  I gave it considerable thought over the last two days.  It is apparent to me that our goals and vision for a potential partnership are not aligned on the key issues."  (ECF No. 21 at ¶ 95.)  That same day, Green responded to Katz's e-mail stating, in part, "[w]hile we are disappointed in your conclusion, we accept that you had a different view of a business relationship than we did."  (ECF No. 21 at ¶ 97.)  Further, Green warned Katz in the e-mail not to use AD&D Plaintiffs' trade secrets or otherwise interfere with the acquisition of Friendship by AD&D Plaintiffs or New Friendship.  (ECF No. 21 at ¶¶ 96−97.)  Additionally, AD&D Plaintiffs withdrew Katz's access to the shared computer drive containing their confidential and proprietary information.  (ECF No. 21 at ¶ 117.)

30.   On September 22, 2016, Greenfield e-mailed Katz and stated "I will be calling [Green] this morning, you may hear from him soon.  I will not mention our tentative deal.  I am just going to say that I am not comfortable with the [promissory]

note." (ECF No. 21 at ¶ 101.) Later that day, Plaintiffs allege that Greenfield called Green and, consistent with his e-mail to Katz, stated that he was uncomfortable financing part of the purchase price with a note and would not proceed with the acquisition of Friendship unless the purchase price was entirely financed with cash. (ECF No. 21 at ¶ 102.) Plaintiffs allege that Greenfield did not inform Green that Katz was pursuing an acquisition of Friendship and concealed his true reason for renouncing the agreed-upon terms of AD&D Plaintiffs' acquisition—that Greenfield had a tentative deal with Katz, under which Greenfield believed he would receive more money than under AD&D Plaintiffs' offer. (ECF No. 21 at ¶¶ 102, 108.)

31. Also on September 22, 2016, Katz and Greenfield exchanged a series of e-mails relating to the potential acquisition of Friendship by Katz. Katz e-mailed Green two updated term sheets, and Greenfield e-mailed Katz the most recent version of the APA that had been prepared by AD&D Plaintiffs. (ECF No. 21 at ¶¶ 103, 109, 122.) Additionally, Greenfield put Katz in contact with Greenfield's and Friendship's banker at SunTrust so that Katz could obtain a loan to finance the acquisition. (ECF No. 21 at ¶ 104.) In order to expedite Katz securing a loan, Susan Greenfield, at Greenfield's request, e-mailed Friendship's financial information directly to SunTrust. (ECF No. 21 at ¶¶ 105−07.)

32. On September 26, 2016, Greenfield forwarded Susan Greenfield an e-mail from Katz that described their negotiations of Katz's acquisition of Friendship. (ECF No. 21 at ¶ 124.) The e-mail included numerous attachments, including versions of

the APA prepared by AD&D Plaintiffs that had been revised to facilitate Katz's acquisition. (ECF No. 21 at ¶ 124.)

33. On September 27, 2016, Greenfield e-mailed Katz stating that he planned to call Green the next day to tell Green that he had another offer to purchase Friendship. (ECF No. 21 at ¶ 110.)

34. On September 28, 2016, Greenfield called Green and informed Green that another party offered to acquire Friendship. (ECF No. 21 at ¶ 111.) Greenfield refused to tell AD&D Plaintiffs that the other party was Katz. (ECF No. 21 at ¶ 111.)

35. On October 24, 2016, AD&D Plaintiffs filed an action against Katz in federal court in Pennsylvania. (ECF No. 21 at ¶ 132.) Greenfield received a copy of AD&D Plaintiffs' complaint by e-mail. (ECF No. 21 at ¶ 133.)

36. On October 28, 2016, Greenfield forwarded Susan Greenfield an e-mail from Katz that contained revised versions of the APA that had been prepared by AD&D Plaintiffs and drafts of exhibits to the APA. (ECF No. 21 at ¶ 125.)

37. On October 30, 2016, Susan Greenfield e-mailed Greenfield her comments and questions about the APA, specifically mentioning that Katz was being sued by AD&D Plaintiffs. (ECF No. 21 at ¶ 135.)

38. On December 16, 2016, SunTrust agreed to loan Katz the necessary funds to acquire Friendship. (ECF No. 21 at ¶ 141.)

39. On February 6, 2017, Katz resigned as a manager of New Friendship. (ECF No. 21 at ¶ 88.)

**E.** **Claims for Relief**

40. On July 24, 2017, Green, Husted, and Milliner voluntarily dismissed their claims for misappropriation of trade secrets and conversion. (ECF No. 45.) The voluntary dismissal states that "Plaintiffs' position now is that Plaintiff [AD&D] exclusively owns the trade secrets and tangible property at issue in the trade secret and conversion claims." (ECF No. 45.) As a result, the Amended Complaint asserts the following claims for relief:

- Misappropriation of trade secrets, brought by AD&D against Katz ("First Claim"), (Am. Compl. 20, ECF No. 21);

- Conversion, brought by AD&D against Katz ("Second Claim"), (ECF No. 21 at 24);

- Breach of fiduciary duty, brought by AD&D Plaintiffs against Katz ("Third Claim"), (ECF No. 21 at 25);

- Constructive fraud, brought by AD&D Plaintiffs against Katz ("Fourth Claim"), (ECF No. 21 at 26);

- Breach of fiduciary duty, brought by New Friendship against Katz ("Fifth Claim"), (ECF No. 21 at 27);

- Constructive fraud, brought by New Friendship against Katz ("Sixth Claim"), (ECF No. 21 at 28);

- Tortious interference with prospective economic advantage, brought by all Plaintiffs against Katz ("Seventh Claim"), (ECF No. 21 at 29);

- Unfair and deceptive trade practices ("UDTP"), brought by all Plaintiffs against Katz ("Eighth Claim"), (ECF No. 21 at 30);

- Misappropriation of trade secrets, brought by AD&D against Greenfield and Friendship ("Ninth Claim"), (ECF No. 21 at 31);

- Conversion, brought by AD&D against Greenfield and Friendship ("Tenth Claim"), (ECF No. 21 at 33);

- Breach of the duty to negotiate in good faith, brought by all Plaintiffs against Greenfield and Friendship ("Eleventh Claim"), (ECF No. 21 at 34);

- Aiding and abetting a breach of fiduciary duty, brought by all Plaintiffs against Greenfield and Friendship ("Twelfth Claim"), (ECF No. 21 at 36);

- Aiding and abetting constructive fraud, brought by all Plaintiffs against Greenfield and Friendship ("Thirteenth Claim"), (ECF No. 21 at 38);

- Civil conspiracy, brought by all Plaintiffs against all Defendants ("Fourteenth Claim"), (ECF No. 21 at 40); and

- UDTP, brought by all Plaintiffs against Greenfield and Friendship ("Fifteenth Claim"), (ECF No. 21 at 41).

41. Katz's Motion seeks dismissal of all claims brought by Green, Husted, and Milliner on the grounds that they lack standing (Third, Fourth, Seventh, Eighth, and Fourteenth Claims). (Partial Mot. Dismiss Pls.' First Am. Compl. by Def. Katz ¶ 1,

ECF No. 32.) Katz's Motion further seeks to dismiss all claims brought by AD&D and AD&D Plaintiffs, (ECF No. 32 at ¶ 2), and New Friendship's claims for tortious interference with prospective economic advantage (Seventh Claim), UDTP (Eighth Claim), and civil conspiracy (Fourteenth Claim), (ECF No. 32 at ¶ 3).

42. Greenfield and Friendship's Motion seeks dismissal of all claims asserted against Greenfield and Friendship for failure to state a claim. (Defs. Greenfield & Friendship's Mot. Dismiss 1, ECF No. 35.) In the alternative, Greenfield and Friendship's Motion seeks to dismiss all claims brought by Green, Husted, and Milliner on the grounds that they lack standing (Eleventh, Twelfth, Thirteenth, Fourteenth, and Fifteenth Claims). (ECF No. 35 at 1.)

### III. LEGAL STANDARD

43. In ruling on a motion to dismiss pursuant to Rule 12(b)(6), the Court reviews the allegations of the Amended Complaint in the light most favorable to Plaintiffs. The Court's inquiry is "whether, as a matter of law, the allegations of the complaint, treated as true, are sufficient to state a claim upon which relief may be granted under some legal theory." *Harris v. NCNB Nat'l Bank of N.C.*, 85 N.C. App. 669, 670, 355 S.E.2d 838, 840 (1987). The Court construes the Amended Complaint liberally and accepts all factual allegations as true. *Laster v. Francis*, 199 N.C. App. 572, 577, 681 S.E.2d 858, 862 (2009). The Court is not required "to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *Good Hope Hosp., Inc. v. N.C. Dep't of Health & Human Servs.*, 174 N.C. App. 266, 274, 620 S.E.2d 873, 880 (2005). The Court can also ignore

a party's legal conclusions set forth in its pleading. *McCrann v. Pinehurst, LLC*, 225 N.C. App. 368, 377, 737 S.E.2d 771, 777 (2013).

44. Dismissal of a claim pursuant to Rule 12(b)(6) is proper "(1) when the complaint on its face reveals that no law supports [the] claim; (2) when the complaint reveals on its face the absence of fact sufficient to make a good claim; [or] (3) when some fact disclosed in the complaint necessarily defeats the . . . claim." *Oates v. JAG, Inc.*, 314 N.C. 276, 278, 333 S.E.2d 222, 224 (1985); *see also Jackson v. Bumgardner*, 318 N.C. 172, 175, 347 S.E.2d 743, 745 (1986). Otherwise, "a complaint should not be dismissed for insufficiency unless it appears to a certainty that plaintiff is entitled to no relief under any state of facts which could be proved in support of the claim." *Sutton v. Duke*, 277 N.C. 94, 103, 176 S.E.2d 161, 166 (1970) (emphasis omitted).

## IV. ANALYSIS

### A. Timeliness of Katz's Motion to Dismiss for Failure to State a Claim

45. As an initial matter, the Court is confronted with an issue on which there is no decisional guidance from our appellate courts. Plaintiffs argue that Katz's Motion for failure to state a claim should be denied because it was filed after Katz filed his answer to the Amended Complaint and, as a result, it is untimely under Rule 12(b). (Pls.' Br. Resp. Defs.' Mots. Dismiss 4–5, ECF No. 41.)

46. Rule 12(b) provides that "[e]very defense, in law or fact, to a claim for relief in any pleading . . . shall be asserted in the responsive pleading thereto if one is required[.]" N.C. Gen. Stat. § 1A-1, Rule 12(b). At the same time, a defense of failure to state a claim upon which relief can be granted may be made by motion. *Id.* A

motion asserting such defense, however, "shall be made *before* pleading if a further pleading is permitted." *Id.* (emphasis added). Therefore, under the express language of Rule 12(b), a Rule 12(b) motion to dismiss for failure to state a claim must be made before filing a responsive pleading. If a party fails to make a Rule 12(b) motion for failure to state a claim before filing a responsive pleading, however, the defense is not waived; rather, the party may raise the *defense*: (1) in any pleading permitted or ordered under Rule 7(a); (2) by motion for judgment on the pleadings; or (3) at trial. *Id.* § 1A-1, Rules 12(b), 12(h)(2).

47. The North Carolina Rules are modeled after the Federal Rules of Civil Procedure ("Federal Rule(s)"). *Sutton*, 277 N.C. at 99, 176 S.E.2d at 164. Decisions under the Federal Rules are pertinent for guidance in interpreting the North Carolina Rules, and it is customary for North Carolina courts to look to such decisions in interpreting the North Carolina Rules. *Bryson v. Sullivan*, 330 N.C. 644, 655, 412 S.E.2d 327, 332 (1992); *Dickens v. Puryear*, 302 N.C. 437, 442, 276 S.E.2d 325, 329 (1981).

48. Similar to North Carolina Rule 12(b), Federal Rule 12(b) provides that "[e]very defense to a claim for relief in any pleading must be asserted in the responsive pleading if one is required[,]" but that a defense for failure to state a claim upon which relief can be granted may be made by motion. Fed. R. Civ. P. 12(b). As under North Carolina Rule 12(b), a motion under Federal Rule 12(b) for failure to state a claim "must be made *before* pleading if a responsive pleading is allowed." *Id.* (emphasis added). Moreover, like North Carolina Rule 12(h)(2), if a party fails to

make a motion under Federal Rule 12(b) for failure to state a claim before filing a responsive pleading, then the party may raise the *defense*: (1) in any pleading under Federal Rule 7(a); (2) by motion for judgment on the pleadings; or (3) at trial. Fed. R. Civ. P. 12(h)(2). Therefore, federal decisions interpreting Federal Rules 12(b) and 12(h) are instructive on this Court's interpretation of Rules 12(b) and 12(h) of the North Carolina Rules.

49. Despite the clear language of Federal Rule 12(b) that a motion asserting a defense listed therein must be made before filing a responsive pleading, various federal courts have applied the timing provision differently. Some federal courts have allowed a defendant to simultaneously file an answer to the complaint and a motion to dismiss for failure to state a claim under Federal Rule 12(b). *See Beary v. West Publ'g Co.*, 763 F.2d 66, 68 (2d Cir. 1985) (stating that plaintiff's contention that defendant waived its right to file a Federal Rule 12(b)(6) motion to dismiss for failure to state a claim by filing an answer was frivolous as "nothing in [Federal Rule 12(b)] prohibits the filing of a motion to dismiss with an answer"); *Beebe v. Williams Coll.*, 430 F. Supp. 2d 18, 21 (D. Mass. 2006) (stating that although it was technically improper for defendant to file an answer and simultaneously move to dismiss for failure to state a claim, the error was immaterial because the defense was mentioned in the answer); *Kuhlmeier v. Hazelwood Sch. Dist.*, 578 F. Supp. 1286, 1290 (E.D. Mo. 1984) ("[T]he preferred rule to apply in situations where a defendant files his [Federal] Rule 12(b) motion simultaneously with his answer is that the motion should

be view[ed] as having preceded the answer and thus as having been interposed in a timely fashion." (alteration in original) (quotation marks omitted)).

50. Additionally, some federal courts have allowed a defendant to file a post-answer Federal Rule 12(b)(6) motion to dismiss as long as the defendant raised the defense in his answer. *See Puckett v. United States*, 82 F. Supp. 2d 660, 663 (S.D. Tex. 1999) ("Technically, a post-answer [Federal] Rule 12(b)(6) motion is untimely and some other vehicle, such as a motion for judgment on the pleadings or for summary judgment, must be used to challenge the failure to state a claim for relief. However, courts do not mechanically or routinely deny any motion made after a responsive pleading as untimely. If the defendant has previously included in the answer the defense raised in the motion, thereby giving notice, then courts generally allow [Federal] Rule 12(b)(6) motions filed after the answer." (citation omitted) (quotation marks omitted)); *Stein v. Kent State Univ. Bd. Trs.*, 994 F. Supp. 898, 902 (N.D. Ohio 1998) ("While normally a party must file a [Federal] Rule 12(b)(6) motion before filing an answer, or simultaneously with filing the responsive pleading, courts have allowed untimely motions if the defense has been previously included in the answer." (quotation marks omitted)); *Lugo-Modesto v. Balmaceda*, No. 94-2634(DRD), 1997 U.S. Dist. LEXIS 23336, at *10−11 (D.P.R. July 7, 1997) ("Courts in this circuit have held that the post-answer filing of a motion to dismiss under [Federal Rule] 12(b)(6) does not warrant the denial of said motion where the defendant, as here, has raised as an affirmative defense the allegation that the complaint fails to state a claim."). *See generally* 5C Charles Alan Wright & Arthur

R. Miller, *Federal Practice and Procedure* § 1361 (3d ed. 2004) ("A strict interpretation of the timing provision's language leads to the conclusion that the district judge must deny any [Federal] Rule 12(b) motion made after a responsive pleading is interposed as being too late. However, federal courts have allowed untimely [Federal Rule 12(b)] motions if the defense has been previously included in the answer.").

51. Conversely, other federal courts, including the Fourth Circuit Court of Appeals and the North Carolina federal district courts, have held that a Federal Rule 12(b)(6) motion to dismiss filed after an answer is untimely and, in accordance with Federal Rule 12(h)(2), construe such motion as a motion for judgment on the pleadings under Federal Rule 12(c). *See Burbach Broad. Co. v. Elkins Radio Corp.*, 278 F.3d 401, 405 (4th Cir. 2002) (construing defendant's post-answer Federal Rule 12(b)(6) motion as a motion for judgment on the pleadings under Federal Rule 12(c)); *Dixon v. Prudential Prime Props.*, No. 4:16-CV-233-D, 2017 U.S. Dist. LEXIS 60068, at *9 n.3 (E.D.N.C. Apr. 10, 2017) ("A party must file a [Federal] Rule 12(b)(6) motion before filing its answer. Where . . . a party moves to dismiss for failure to state a claim after it has already answered the complaint, courts construe the motion as one for judgment on the pleadings under [Federal] Rule 12(c)." (citation omitted)); *Action NC v. Strach*, 216 F. Supp. 3d 597, 613 (M.D.N.C. 2016) ("Where . . . Defendants have filed an Answer, a [Federal] Rule 12(b)(6) motion should be viewed as a [Federal] Rule 12(c) motion for judgment on the pleadings." (quotation marks omitted)); *Lockhart v. Coastal Int'l Sec., Inc.*, 905 F. Supp. 2d 105, 112 (D.D.C. 2012) (construing a post-answer Federal Rule 12(b) motion as a motion for judgment on the pleadings);

*Xerox Corp. v. Apple Comput., Inc.*, 734 F. Supp. 1542, 1543 (N.D. Cal. 1990) ("An untimely motion to dismiss is treated as a motion for judgment on the pleadings."); *Paul v. McGhee*, 577 F. Supp. 460, 462 (E.D. Tenn. 1983) ("Since defendants answered the complaint before submitting the [Federal Rule] 12(b)(6) motion, the motion is untimely. Therefore, the Court will consider defendants' motion as a motion for judgment on the pleadings under [Federal Rule 12(c)].").

52.     Katz argues that this line of federal decisions under Federal Rule 12(b)—that is, the treatment of a post-answer motion to dismiss for failure to state a claim as a motion for judgment on the pleadings—does not apply to Rule 12(b) of the North Carolina Rules. (Reply Br. Supp. Partial Mot. Dismiss 2 n.1, ECF No. 42.) Katz contends that this principle does not apply because, unlike Federal Rule 12(b), the third sentence of North Carolina Rule 12(b) provides—after stating that a motion asserting any defense listed in Rule 12(b)(1)−(7) shall be made before pleading—that "[t]he consequences of failure to make such a motion shall be as provided in sections (g) and (h)." N.C. Gen. Stat. § 1A-1, Rule 12(b). As discussed above, however, both Federal Rule 12(h)(2) and North Carolina Rule 12(h)(2) provide that the defense of failure to state a claim may be made in any pleading under Rule 7(a), by motion for judgment on the pleadings, or at trial. Indeed, the basis on which federal courts have treated post-answer motions to dismiss for failure to state a claim as motions for judgment on the pleadings is the language set forth in Federal Rule 12(h)(2). *See, e.g., Dixon*, 2017 U.S. Dist. LEXIS 60068, at *9 n.3 (citing Fed. R. Civ. P. 12(h)(2));

*Lockhart*, 905 F. Supp. 2d at 112 (same); *Paul*, 577 F. Supp. at 462 (same). Further, the comment to North Carolina Rule 12 states:

> The third sentence in section (b) has as its purpose the clarification of the preceding sentence. Ordinarily, of course, a motion making any of the listed defenses should be made before pleading. But the failure to do so is not preclusive in all circumstances and as to all defenses, as sections (g) and (h) of this rule make clear.

N.C. Gen. Stat. § 1A-1, Rule 12 cmt. The Court does not agree with Katz that the additional clarifying language in North Carolina Rule 12(b), which states that Rules 12(g) and 12(h) provide the consequences of failing to make a timely motion under Rule 12(b), precludes treating an untimely Rule 12(b)(6) motion as a Rule 12(c) motion—as Rule 12(h)(2) expressly provides.

53. The Court concludes that, under the express language of Rule 12(b), and in the absence of case law from our appellate courts interpreting such language to mean otherwise, a Rule 12(b) motion to dismiss for failure to state a claim must be filed prior to an answer. The Court further concludes that, under Rules 12(b) and 12(h)(2), a post-answer Rule 12(b) motion to dismiss for failure to state a claim may, if appropriate, be considered as a Rule 12(c) motion for judgment on the pleadings.

54. Here, Katz filed his answer to the Amended Complaint on April 21, 2017. The answer asserts as a first defense "Motion to Dismiss Under Rule 12(b)(6)." (Answer 29, ECF No. 31.) Thereafter, on April 24, 2017, Katz filed his Rule 12(b)(6) motion to dismiss and a brief in support. Pursuant to Rule 7.2 of the General Rules of Practice and Procedure for the North Carolina Business Court ("BCR"), all motions must be set out in a separate document. Therefore, to the extent that Katz argues

that the Rule 12(b)(6) defense asserted in his answer is a timely Rule 12(b) motion, it is not a proper motion under BCR 7.2. As a result, a motion to dismiss for failure to state a claim was not before this Court until Katz's Motion was filed on April 24, 2017—three days after Katz filed his answer. Therefore, Katz's Motion is untimely.

55. Katz nonetheless argues that his motion was timely filed by the deadline set forth in the Court's April 18, 2017 Case Management Order. (Reply Br. 3, ECF No. 42.) Under the Case Management Order, the parties were to file all motions to dismiss or other preliminary or pre-discovery motions on or before May 31, 2017. This deadline, however, does not obviate application of the Rules, which plainly state that a Rule 12(b) motion for failure to state a claim must be made before filing an answer.

56. Therefore, Katz's Motion, to the extent it seeks dismissal for failure to state a claim, is untimely under Rule 12(b). Accordingly, the Court addresses whether Katz's Motion may properly be considered as a Rule 12(c) motion for judgment on the pleadings.

57. "After the pleadings are closed but within such time as not to delay the trial, any party may move for judgment on the pleadings." N.C. Gen. Stat. § 1A-1, Rule 12(c). "[T]he pleadings are not closed until all defendants have filed an answer, even when one defendant has filed a motion to dismiss instead of answering." *Garvey v. Seterus, Inc.*, No. 5:16-cv-00209-RLV, 2017 U.S. Dist. LEXIS 97373, at *35 (W.D.N.C. June 23, 2017) (alteration in original); *see also Gillespie v. City of Battle Creek*, 100 F. Supp. 3d 623, 628 (W.D. Mich. 2015) (stating that the pleadings were not closed because one defendant had not filed an answer); *E. Coast Test Prep LLC v.*

*Allnurses.com, Inc.*, No. 15-3705 (JRT/JSM), 2016 U.S. Dist. LEXIS 176900, at \*2 (D. Minn. Dec. 20, 2016) ("Some courts have exercised discretion to allow a motion for judgment on the pleadings before all defendants have answered in only limited circumstances, such as when a plaintiff fails to serve one of the defendants." (quotation marks omitted)); *Moran v. Peralta Cmty. Coll. Dist.*, 825 F. Supp. 891, 894 (N.D. Cal. 1993) ("[Federal Rule] 12(c) motions may not be brought until the pleadings are closed. Ordinarily, this means that a [Federal] Rule 12(c) motion must await the answers of all defendants.").

58.     Here, Greenfield and Friendship have not filed an answer to the Amended Complaint and, thus, the pleadings are not closed. As a result, the Court cannot construe Katz's Motion as one for judgment on the pleadings pursuant to Rule 12(c). *See Garvey*, 2017 U.S. Dist. LEXIS 97373, at \*34−35 (concluding that defendant's Federal Rule 12(c) motion was premature because not all defendants had filed answers to the complaint and denying such motion without prejudice); *see also Gillespie*, 100 F. Supp. 3d at 628 (concluding that defendants' Federal Rule 12(c) motion was premature because not all defendants had filed answers to the complaint, but nevertheless considering the motion as a post-answer Federal Rule 12(b)(6) motion). Therefore, the Court denies Katz's Motion, to the extent it seeks dismissal of any of Plaintiffs' claims for failure to state a claim, without prejudice to refiling the motion under Rule 12(c) after the pleadings are closed.

**B.    Green, Husted, and Milliner's Standing**

59.    Greenfield and Friendship's Motion seeks dismissal of Green, Husted, and Milliner's claims pursuant to Rule 12(b)(1) for lack of standing.  (Defs. Greenfield & Friendship's Mot. Dismiss 1, ECF No. 35.)  Likewise, Katz's Motion alternatively moves to dismiss Green, Husted, and Milliner's claims pursuant to Rule 12(b)(1) on the grounds that they lack standing.  (Partial Mot. Dismiss 1 n.1, ECF No. 32.)  Unlike a Rule 12(b) motion for failure to state a claim, Rule 12(h)(3) provides that "[w]henever it appears by suggestion of the parties or otherwise that the court lacks jurisdiction of the subject matter, the court shall dismiss the action."  N.C. Gen. Stat. § 1A-1, Rule 12(h)(3).  "Standing is a necessary prerequisite to a court's proper exercise of subject matter jurisdiction."  *Neuse River Found., Inc. v. Smithfield Foods, Inc.*, 155 N.C. App. 110, 113, 574 S.E.2d 48, 51 (2002).  Therefore, the Court properly considers Katz's Motion to the extent it seeks to dismiss Green, Husted, and Milliner's claims for lack of standing under Rule 12(b)(1).

60.    Defendants argue that Green, Husted, and Milliner do not have standing to assert any claims against Defendants because all claims belong to AD&D or New Friendship.  (Br. Supp. Partial Mot. Dismiss by Def. Katz 7−10, ECF No. 33; Mem. Supp. Defs. Greenfield & Friendship's Mot. Dismiss 6−7, ECF No. 36.)  It is a well-settled principle of North Carolina law that shareholders of a corporation cannot pursue individual causes of action for wrongs or injuries to the corporation.  *Barger v. McCoy Hillard & Parks*, 346 N.C. 650, 658, 488 S.E.2d 215, 219 (1997); *Corwin v. British Am. Tobacco PLC*, 796 S.E.2d 324, 338 (N.C. Ct. App. 2016).  There are two

exceptions: (1) when there is a special duty between the wrongdoer and the shareholder; and (2) when the shareholder suffered an injury separate and distinct from the injury suffered by the corporation and the other shareholders. *Barger*, 346 N.C. at 658, 488 S.E.2d at 219; *Corwin*, 796 S.E.2d at 338; *Levin v. Jacobson*, 2015 NCBC LEXIS 111, at *14–15 (N.C. Super. Ct. Dec. 7, 2015) (stating that for purposes of whether a member of an LLC can assert an individual claim, "members of an LLC are treated like corporate shareholders and managers are similar to directors"); *see* Russell M. Robinson, II, *Robinson on North Carolina Corporation Law* § 34.04[5] (7th ed. 2016) ("A derivative action on behalf of an LLC will be governed by essentially the same rules that apply to a derivative action on behalf of a corporation. Therefore, whether the member must bring the suit individually or on behalf of the LLC turns on whether the alleged injuries were caused directly to the member or are a consequence of breaches of fiduciary duty that harmed the LLC." (footnote omitted)).

61.     For the special duty exception to apply, "the duty must be one that the alleged wrongdoer owed directly to the shareholder as an individual"—a duty that was personal to the shareholder and separate and distinct from the fiduciary duty owed to the corporation. *Barger*, 346 N.C. at 659, 488 S.E.2d at 220. In *Barger*, our Supreme Court set forth an illustrative, non-exclusive list of situations in which a special duty may be found. Such list included when the wrongful actions of the party induced plaintiff to become a shareholder, the wrongdoer violated his fiduciary duty to the shareholder, the wrongdoer performed individualized services directly for the shareholder, and the wrongdoer undertook to advise shareholders independently of

the corporation. *Id.* "A fiduciary duty may constitute a 'special duty' when owed directly to a party." *Corwin*, 796 S.E.2d at 338.

62. It is well settled that a manager of a limited liability company owes fiduciary duties to the company, not to the individual members. N.C. Gen. Stat. § 57D-3-21(b); *Kaplan v. O.K. Techs., L.L.C.*, 196 N.C. App. 469, 474, 675 S.E.2d 133, 137 (2009). Further, members of a limited liability company do not owe fiduciary duties to each other or to the company, except a controlling member owes fiduciary duties to minority members. *Kaplan*, 196 N.C. App. at 473, 675 S.E.2d at 137. These principles, however, do not control the determination of the Motions under the specific allegations of the Amended Complaint.

63. Here, the Amended Complaint alleges that AD&D Plaintiffs and Katz consummated a joint venture and, accordingly, Katz owed fiduciary duties to each of the AD&D Plaintiffs by virtue of his status as a participant in the joint venture. (Am. Compl. ¶¶ 177–79, ECF No. 21.) A joint venture is an association of persons to engage in and carry out a business for profit. *Se. Shelter Corp. v. Btu, Inc.*, 154 N.C. App. 321, 327, 572 S.E.2d 200, 204 (2002). A joint venture is a kind of partnership and is governed by substantially the same rules that govern partnerships. *Pike v. Wachovia Bank & Tr. Co.*, 274 N.C. 1, 9, 161 S.E.2d 453, 460 (1968). "[T]he essential elements of a joint venture are (1) an agreement to engage in a single business venture with the joint sharing of profits, (2) with each party to the joint venture having a right in some measure to direct the conduct of the other through a necessary fiduciary

relationship." *Se. Shelter Corp.*, 154 N.C. App. at 327, 572 S.E.2d at 204 (citation omitted) (quotation marks omitted).

64. As to the first element, such agreement may be express or implied. *Id.*; *Compton v. Kirby*, 157 N.C. App. 1, 11, 577 S.E.2d 905, 912 (2003) ("A partnership may be inferred from all the circumstances, so long as the circumstances demonstrate a meeting of the minds with respect to the material terms of the partnership agreement."). "[T]he parties must combine their property, money, efforts, skill, or knowledge in some common undertaking." *Se. Shelter Corp.*, 154 N.C. App. at 327, 572 S.E.2d at 204.

65. The Amended Complaint alleges that AD&D, Green, Husted, Milliner, and Katz entered into a joint venture to identify and jointly acquire suitable businesses with the joint sharing of profits. (ECF No. 21 at ¶¶ 33, 177−78.) The Amended Complaint contains factual allegations stating that they combined their efforts, knowledge, and experience to acquire suitable businesses, including Friendship, at least until September 21, 2016 when Katz e-mailed Green stating that their goals were no longer aligned. For example, AD&D contributed its financial models, Katz brought Friendship to AD&D Plaintiffs' attention, and, thereafter, AD&D Plaintiffs and Katz traveled to North Carolina to meet with Greenfield and discuss acquiring Friendship. (ECF No. 21 at ¶¶ 2, 34−35, 44, 46.) Green ultimately sent Greenfield a proposal for the acquisition of Friendship by AD&D Plaintiffs and Katz. (ECF No. 21 at ¶¶ 53, 55.) Green, Husted, Milliner, and Katz formed New Friendship for the sole purpose of acquiring Friendship. (ECF No. 21 at ¶¶ 72−73.) Additionally, the

Amended Complaint alleges that AD&D Plaintiffs and Katz were exploring joint acquisitions in other states as far south as Florida. (ECF No. 21 at ¶ 45.)

66.     Therefore, the Court concludes that, at this stage of the proceeding, the allegations sufficiently state that AD&D, Green, Husted, Milliner, and Katz entered into a joint venture such that Katz owed a fiduciary duty, and thus a special duty, to each Green, Husted, and Milliner separate and apart from any fiduciary duty Katz may have owed to AD&D or New Friendship. Accordingly, the Court concludes, based on the allegations of the Amended Complaint, that Green, Husted, and Milliner have standing to assert their claims against Katz. *See Munger v. State*, 202 N.C. App. 404, 410, 689 S.E.2d 230, 235 (2010) ("[I]f the trial court confines its evaluation [of standing] to the pleadings, the court must accept as true the plaintiff's allegations and construe them in the light most favorable to the plaintiff."); *Neuse River Found., Inc.*, 155 N.C. App. at 113, 574 S.E.2d at 51 ("[E]ach element [of standing] must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of the litigation.").

67.     Green, Husted, and Milliner assert, together with AD&D and New Friendship, claims against Greenfield and Friendship for aiding and abetting a breach of fiduciary duty, aiding and abetting constructive fraud, UDTP, and breach of the duty to negotiate in good faith. As discussed more fully below, the aiding and abetting claims are based on Greenfield and Friendship's alleged participation in Katz's alleged breach of his fiduciary duty to Plaintiffs, including Green, Husted, and

Milliner. Similarly, the UDTP claim is based, in part, on the aiding and abetting claims. The Court has concluded that, at the pleading stage, the Amended Complaint sufficiently alleges that Katz owed a fiduciary duty, and thus a special duty, to Green, Husted, and Milliner. As such, the Court likewise concludes that Green, Husted, and Milliner have standing to assert their aiding and abetting claims, and thus their UDTP claim, against Greenfield and Friendship based on their alleged participation in Katz's breach of fiduciary duty and constructive fraud.

68. As to Green, Husted, and Milliner's claim for breach of the duty to negotiate in good faith, for the reasons explained below, this claim is more appropriately considered as one for breach of contract based on an agreement to continue negotiating in good faith. Plaintiffs allege that AD&D Plaintiffs on the one hand, and Greenfield and Friendship on the other, agreed to negotiate in good faith the terms of the acquisition that remained open. (ECF No. 21 at ¶ 262.) Plaintiffs allege that Greenfield and Friendship breached this agreement by abandoning their negotiations with AD&D Plaintiffs. (ECF No. 21 at ¶¶ 90, 100−02.) These allegations are sufficient, at the pleading stage, to state that Green, Husted, and Milliner—as parties to the alleged agreement—have standing to assert their claim against Greenfield and Friendship for breach of that agreement.

69. As such, the Motions to dismiss Green, Husted, and Milliner's claims for lack of standing are denied.

## C.  Greenfield and Friendship's Motion

### 1.  Misappropriation of Trade Secrets (Ninth Claim)

70.  Greenfield and Friendship argue that AD&D's claim for misappropriation of trade secrets fails to state a claim because the Amended Complaint does not identify a trade secret with sufficient particularity, and the Amended Complaint fails to allege reasonable efforts to maintain the secrecy of any alleged trade secret.  (Mem. Supp. Defs. Greenfield & Friendship's Mot. Dismiss 7−11.)

71.  The North Carolina Trade Secrets Protection Act ("TSPA") defines "trade secret" as

> business or technical information, including but not limited to a formula, pattern, program, device, compilation of information, method, technique, or process that:
>
> a. Derives independent actual or potential commercial value from not being generally known or readily ascertainable through independent development or reverse engineering by persons who can obtain economic value from its disclosure or use; and
>
> b. Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

N.C. Gen. Stat. § 66-152(3).  The TSPA defines "misappropriation" as "acquisition, disclosure, or use of a trade secret of another without express or implied authority or consent, unless such trade secret was arrived at by independent development, reverse engineering, or was obtained from another person with a right to disclose the trade secret." *Id.* § 66-152(1).  "To plead misappropriation of trade secrets, 'a plaintiff must identify a trade secret with sufficient particularity so as to enable a defendant to delineate that which he is accused of misappropriating and a court to determine

whether misappropriation has or is threatened to occur.'" *VisionAIR, Inc. v. James*, 167 N.C. App. 504, 510–11, 606 S.E.2d 359, 364 (2004) (quoting *Analog Devices, Inc. v. Michalski*, 157 N.C. App. 462, 468, 579 S.E.2d 449, 453 (2003)); *Bldg. Ctr., Inc. v. Carter Lumber, Inc.*, 2016 NCBC LEXIS 79, at *11 (N.C. Super. Ct. Oct. 21, 2016).

72.    AD&D alleges that Greenfield and Friendship misappropriated the APA that AD&D Plaintiffs shared with Greenfield and Friendship pursuant to their negotiations of an acquisition of Friendship by AD&D Plaintiffs. (ECF No. 21 at 31–32.) The Amended Complaint identifies the specific dates on which the APA was first e-mailed to Greenfield and Friendship, as well as the time period over which various drafts of the APA were e-mailed to Greenfield and Friendship by Green and AD&D Plaintiffs' counsel. (ECF No. 21 at ¶¶ 61–63.) The Court concludes that, at the Rule 12(b)(6) stage, the Amended Complaint identifies the alleged trade secret with sufficient particularity to enable Greenfield and Friendship to delineate that which they are accused of misappropriating and to enable this Court to determine whether misappropriation has occurred.

73.    "Generally, only where efforts to maintain secrecy of the allegedly misappropriated trade secrets were completely absent have North Carolina courts dismissed claims at the 12(b)(6) stage." *Bldg. Ctr., Inc.*, 2016 NCBC LEXIS 79, at *14. Here, the Amended Complaint alleges that AD&D stored the APA on a password-protected computer drive and disclosed it only to the other parties to the negotiations. (ECF No. 21 at ¶ 68.) AD&D Plaintiffs withdrew Katz's access to the computer drive after Katz e-mailed Green on September 21, 2016 stating that their

goals were no longer aligned. (ECF No. 21 at ¶ 117.) The Amended Complaint further alleges that, in June 2016, AD&D Plaintiffs, Katz, and Greenfield entered into nondisclosure agreements regarding their negotiations "over the acquisition of Friendship." (ECF No. 21 at ¶ 47.) Taking the allegations as true and construing them in the light most favorable to Plaintiffs, as the Court must at this stage, such nondisclosure agreements concerning AD&D Plaintiffs, Katz, and Greenfield and Friendship's negotiations over the acquisition of Friendship conceivably include the APA, which the parties exchanged and frequently revised pursuant to their negotiations over the acquisition.

74. Therefore, the Court concludes that, at the Rule 12(b)(6) stage, the Amended Complaint sufficiently alleges that AD&D took reasonable efforts to maintain the secrecy of the APA. As a result, Greenfield and Friendship's Motion to dismiss AD&D's Ninth Claim for misappropriation of trade secrets is denied.

### 2. Conversion (Tenth Claim)

75. AD&D alleges that Greenfield and Friendship wrongfully converted the APA. (ECF No. 21 at ¶¶ 251−53.) Greenfield and Friendship argue that the Amended Complaint fails to state a claim for conversion because it does not allege that AD&D was deprived of use of the APA. (Mem. Supp. Defs. Greenfield & Friendship's Mot. Dismiss 12−13, ECF No. 36.)

76. Conversion is (1) an unauthorized assumption and exercise of the right of ownership over goods or personal property belonging to another, and (2) a wrongful possession or conversion by defendant, regardless of the subsequent application of

the converted property. *Variety Wholesalers, Inc. v. Salem Logistics Traffic Servs., LLC*, 365 N.C. 520, 523, 723 S.E2d 744, 747 (2012). "The essence of conversion is not the acquisition of property by the wrongdoer, but a wrongful deprivation of it to the owner . . . ." *Id.* at 530, 723 S.E.2d at 751.

77. "[T]he weight of authority[] treats electronic documents as personal property subject to a claim for conversion." *Addison Whitney, LLC v. Cashion*, 2017 NCBC LEXIS 51, at *16 (N.C. Super. Ct. June 9, 2017). As Judge Conrad explained in *Addison Whitney*, however,

> [t]he more difficult question is what action constitutes a *conversion* of computerized information. Electronic documents are easy to copy at the stroke of a key or click of a button, and storage media are abundant, varied, and relatively inexpensive. Businesses and individuals routinely store copies of files remotely on servers or in the cloud—instant redundancy that greatly minimizes the risk of losing valuable information due to either misfortune or malfeasance. In other words, a thief may steal a copy, but the information itself is hard to destroy.

*Id.* at *16–17. This Court has concluded that merely making a copy of, as opposed to deleting, electronically stored information does not support a conversion claim because the owner is not deprived of possession or use of the information. *Id.* at *17; *RCJJ, LLC v. RCWIL Enters., LLC*, 2016 NCBC LEXIS 46, at *53 (N.C. Super. Ct. June 20, 2016); *RoundPoint Mortg. Co. v. Florez*, 2016 NCBC LEXIS 18, at *55 (N.C. Super. Ct. Feb. 18, 2016); *Horner Int'l Co. v. McKoy*, 2014 NCBC LEXIS 68, at *6–8 (N.C. Super. Ct. Dec. 18, 2014).

78. Like the plaintiff in *Addison Whitney*, Plaintiffs here rely on *Bridgetree, Inc. v. Red F Mktg. LLC*, No. 3:10-cv-00228-FDW-DSC, 2013 U.S. Dist. LEXIS 15372 (W.D.N.C. Feb. 5, 2013), arguing that Greenfield and Friendship's wrongful

possession of tangible copies of the APA is sufficient to support a conversion claim regardless of whether AD&D still has possession and access to the APA in electronic form. (Pls.' Br. Resp. Defs.' Mots. Dismiss 22, ECF No. 41.)

79. The Court agrees with the reasoning set forth in *Addison Whitney*, *RCJJ*, *RoundPoint*, and *Horner* and finds *Bridgetree* not controlling here. Further, as aptly noted by Judge Conrad,

> the acquisition of paper photocopies does not ordinarily give rise to a conversion claim where the owner retained the original. The Court sees no reason that businesses operating in a paperless environment should be placed in a more favorable legal position than businesses that store documents the old fashioned way.

*Addison Whitney, LLC*, 2017 NCBC LEXIS 51, at *18 (citation omitted).

80. Based on the foregoing, the Court concludes that AD&D's conversion claim must be dismissed. AD&D's conversion claim pertains entirely to Greenfield and Friendship's wrongful possession of a tangible copy of the APA that Plaintiffs sent to Greenfield and Friendship by e-mail. The Amended Complaint does not allege that Greenfield and Friendship deprived AD&D of possession or access to the APA; rather, it alleges that the APA was reduced to tangible form, over which Greenfield and Friendship wrongfully assumed and exercised ownership. (ECF No. 21 at ¶ 253.) The allegations of the Amended Complaint are therefore insufficient to state a claim for conversion. Accordingly, Greenfield and Friendship's Motion as to AD&D's Tenth Claim for conversion is granted.

### 3. Breach of Duty to Negotiate in Good Faith (Eleventh Claim)

81. As a preliminary matter, although the Eleventh Claim is labeled "breach of duty to negotiate in good faith," the claim alleges breach of an agreement to negotiate in good faith and, as such, is more appropriately considered as a claim for breach of contract. Plaintiffs allege that

> [o]n or around August 22, 2016, the AD&D Plaintiffs on the one hand, and Greenfield and Friendship on the other, agreed on the principal terms of an acquisition of Friendship that would involve the AD&D Plaintiffs and agreed to negotiate in good faith to resolve any open terms and finalize that acquisition.

(ECF No. 21 at ¶ 262.) Greenfield and Friendship argue that the factual allegations of the Amended Complaint make clear that any alleged agreement to negotiate in good faith was between AD&D Plaintiffs and Katz on the one hand, and Greenfield and Friendship on the other. (Mem. Supp. Defs. Greenfield & Friendship's Mot. Dismiss 14−16, ECF No. 36; Greenfield & Friendship's Reply Br. Supp. Mot. Dismiss 4−6, ECF No. 43.) According to Greenfield and Friendship, there is therefore no enforceable agreement to negotiate in good faith solely between Greenfield and Friendship on the one hand, and AD&D Plaintiffs on the other, to support Plaintiffs' claim. (ECF No. 36 at 14−16; ECF No. 43 at 4−6.)

82. A valid contract requires assent, mutuality of obligation, and definite terms. *Charlotte Motor Speedway, LLC v. Cty. of Cabarrus*, 230 N.C. App. 1, 7, 748 S.E.2d 171, 176 (2013). Although the North Carolina appellate courts have not addressed whether North Carolina law recognizes a claim for breach of an *implied* agreement to negotiate in good faith, this Court has recognized that an express

agreement to negotiate in good faith may support a breach of contract claim. *Recurrent Energy Dev. Holdings, LLC v. SunEnergy1, LLC*, 2017 NCBC LEXIS 18, at *45−46 (N.C. Super. Ct. Mar. 7, 2017) (distinguishing a claim for breach of a duty to negotiate in good faith arising out of the parties' negotiations and conduct, on the one hand, from an express agreement to negotiate in good faith, on the other hand); *see also Remi Holdings, LLC v. IX WR 3023 HSBC Way L.P.*, 2016 NCBC LEXIS 110, at *18−19 (N.C. Super. Ct. Dec. 12, 2016) (distinguishing an unenforceable letter of intent from a binding agreement to negotiate in good faith); *RREF BB Acquisitions, LLC v. MAS Props., L.L.C.*, 2015 NCBC LEXIS 61, at *57 (N.C. Super. Ct. June 9, 2015) ("The Court sees no reason that an agreement to continue negotiating in good faith would not be enforceable, provided that it met all of the requirements for contract formation under North Carolina law.").

83.  Here, Plaintiffs allege that on August 22, 2016, AD&D Plaintiffs on the one hand, and Greenfield and Friendship on the other, agreed to negotiate in good faith the terms of the acquisition that remained open.  (ECF No. 21 at ¶ 262.)  This allegation is sufficient, at the pleading stage, to state a valid agreement to negotiate in good faith.

84.  While Plaintiffs also allege that the agreement to negotiate in good faith was entered into between AD&D Plaintiffs and Katz on the one hand, and Greenfield and Friendship on the other, this does not preclude Plaintiffs' claim.  First, as discussed above, Plaintiffs also allege that AD&D Plaintiffs, without Katz, entered into an agreement with Greenfield and Friendship to negotiate open terms in good

faith. Second and last, even assuming the agreement was between both AD&D Plaintiffs and Katz on the one hand, and Greenfield and Friendship on the other, the allegations are sufficient, at the pleading stage, to state that Greenfield and Friendship breached this agreement as to AD&D Plaintiffs. Plaintiffs allege that Greenfield and Friendship agreed to partially finance the purchase price with a note, but then one month later refused to go forward with the deal unless the purchase price was entirely financed by cash. (ECF No. 21 at ¶¶ 102, 112, 264.) Further, Plaintiffs allege that after the parties agreed to negotiate in good faith, Greenfield suggested to Katz that Katz purchase Friendship for himself and told Katz that he would not mention Greenfield and Friendship's tentative deal with Katz to Green, but would instead tell Green he was not comfortable with financing the purchase price by a note. (ECF No. 21 at ¶¶ 90, 100−02.) Plaintiffs contend that Greenfield and Friendship refused to negotiate the open terms of the acquisition and abandoned these negotiations to pursue a deal with Katz and Katz alone. (ECF No. 21 at ¶ 265.)

85. The Court concludes that, at the Rule 12(b)(6) stage, the allegations are sufficient to state a claim for breach of an agreement to negotiate in good faith. Therefore, Greenfield and Friendship's Motion as to Plaintiffs' Eleventh Claim is denied.

**4. Aiding and Abetting Breach of Fiduciary Duty and Aiding and Abetting Constructive Fraud (Twelfth and Thirteenth Claims)**

86. Plaintiffs assert claims against Greenfield and Friendship for aiding and abetting Katz's breach of fiduciary duty and aiding and abetting Katz's constructive fraud. (ECF No. 21 at 36−39.)

87. It remains unclear whether North Carolina recognizes a claim for aiding and abetting a breach of fiduciary duty. *E.g.*, *Transatlantic Healthcare, LLC v. Alpha Constr. of the Triad, Inc.*, 2017 NCBC LEXIS 21, at *25 (N.C. Super. Ct. Mar. 9, 2017); *Krawiec v. Manly*, 2016 NCBC LEXIS 7, at *40 (N.C. Super. Ct. Jan. 22, 2016); *Veer Right Mgmt. Grp., Inc. v. Czarnowski Display Serv., Inc.*, 2015 NCBC LEXIS 13, at *6 (N.C. Super. Ct. Feb. 4, 2015); *BDM Invs. v. Lenhil, Inc.*, 2014 NCBC LEXIS 6, at *49 (N.C. Super. Ct. Mar. 20, 2014). Likewise, it is unsettled whether North Carolina recognizes a claim for aiding and abetting constructive fraud. *Bradshaw v. Maiden*, 2015 NCBC LEXIS 80, at *39 (N.C. Super. Ct. Aug. 10, 2015). If North Carolina were to recognize such a claim, however, courts have concluded that the claim would be similar to a claim for aiding and abetting a breach of fiduciary duty. *Id.* Indeed, Plaintiffs base their aiding and abetting constructive fraud claim on the same allegations on which they base their claim for aiding and abetting a breach of fiduciary duty. (*Compare* ECF No. 21 at ¶¶ 269−82, *with* ECF No. 21 at ¶¶ 283−96.)

88. Although it remains open whether North Carolina recognizes a claim for aiding and abetting a breach of fiduciary duty, if North Carolina were to recognize such a claim, then "the elements would include: (1) violation of a fiduciary duty by

the primary party; (2) knowledge of the violation by the aiding and abetting party; and (3) substantial assistance by the aider and abettor in achieving the primary violation." *Veer Right Mgmt. Grp., Inc.*, 2015 NCBC LEXIS 13, at *8.

89.     Plaintiffs argue that, at a minimum, the Court should defer ruling on Plaintiffs' aiding and abetting claims as this Court did in *Veer Right*. (Pls.' Br. Resp. 34, ECF No. 41.)   In *Veer Right*, Judge Gale concluded that because plaintiff adequately pleaded its civil conspiracy claim to withstand a Rule 12(b)(6) motion, and because discovery as to the conspiracy claim and the aiding and abetting claim appeared to substantially overlap, "an early ruling on the aiding and abetting claim would yield no apparent cost efficiencies."  *Veer Right Mgmt. Grp., Inc.*, 2015 NCBC LEXIS 13, at *8.  As a result, Judge Gale deferred ruling on defendant's Rule 12(b)(6) motion to dismiss plaintiff's aiding and abetting claim.  *Id.* at *8−9.

90.     Similarly, in *Bradshaw*, Judge Bledsoe declined to dismiss plaintiffs' aiding and abetting constructive fraud claim, concluding that

> the current uncertainty concerning the viability of a claim for aiding and abetting constructive fraud under North Carolina law and the anticipated overlapping discovery on Plaintiffs' claims for aiding and abetting constructive fraud, civil conspiracy, gross negligence and grossly negligent misrepresentation . . . are sufficiently similar to the circumstances in *Veer Right* to compel similar treatment.

*Bradshaw*, 2015 NCBC LEXIS 80, at *40−41.

91.     Here, as the aiding and abetting claims and the civil conspiracy claim focus on Greenfield and Friendship's participation in Katz's breach of fiduciary duty and constructive fraud, the Court believes that, as in *Veer Right* and *Bradshaw*, anticipated discovery on the aiding and abetting claims substantially overlaps with

anticipated discovery on the civil conspiracy claim. Further, North Carolina law on the viability of a claim for aiding and abetting a breach of fiduciary duty is no more certain than it was when this Court decided *Veer Right* and *Bradshaw*, and, as discussed below, the Court concludes that Plaintiffs have sufficiently alleged a civil conspiracy claim to withstand Greenfield and Friendship's Motion. As a result, the Court, in its discretion, declines to dismiss Plaintiffs' aiding and abetting claims at this time, without prejudice to revisiting the claims by later motion practice.

### 5. Civil Conspiracy (Fourteenth Claim)

92. Plaintiffs assert a civil conspiracy claim against Defendants based on Plaintiffs' claims for breach of fiduciary duty and constructive fraud. (ECF No. 21 at ¶ 298.) Greenfield and Friendship argue that the Amended Complaint fails to state a claim for civil conspiracy because the factual allegations are insufficient to allege an agreement between Katz on the one hand, and Greenfield and Friendship on the other, to do an unlawful act. (Mem. Supp. Defs. Greenfield & Friendship's Mot. Dismiss 21–22, ECF No. 36.)

93. The purpose of a conspiracy claim is to associate defendants together to impose joint and several liability on the conspirators for injury resulting from the acts of any one conspirator done in furtherance of the conspiracy. *Neugent v. Beroth Oil Co.*, 149 N.C. App. 38, 53, 560 S.E.2d 829, 838 (2002). There is not a separate cause of action for civil conspiracy—if the underlying claim fails, the conspiracy claim must also fail. *Strickland v. Hedrick*, 194 N.C. App. 1, 19, 669 S.E.2d 61, 73 (2008). Under North Carolina law, "[t]he elements of a civil conspiracy are: (1) an agreement

between two or more individuals; (2) to do an unlawful act or to do a lawful act in an unlawful way; (3) resulting in injury to plaintiff inflicted by one or more of the conspirators; and (4) pursuant to a common scheme." *Id.* at 19, 669 S.E.2d at 72. Further,

> [a] threshold requirement in any cause of action for damages caused by acts committed pursuant to a conspiracy must be the showing that a conspiracy in fact existed. The existence of a conspiracy requires proof of an agreement between two or more persons. Although civil liability for conspiracy may be established by circumstantial evidence, the evidence of the agreement must be sufficient to create more than a suspicion or conjecture in order to justify submission to a jury.

*S.N.R. Mgmt. Corp. v. Danube Partners 141, LLC*, 189 N.C. App. 601, 609, 659 S.E.2d 442, 449 (2008) (quoting *Dove v. Harvey*, 168 N.C. App. 687, 690−91, 608 S.E.2d 798, 801 (2005)).

94. Plaintiffs allege that, after Greenfield and Friendship agreed to AD&D Plaintiffs' proposal to acquire Friendship and to continue negotiating terms that remained open, Greenfield suggested to Katz that Katz purchase Friendship for himself. (ECF No. 21 at ¶ 90.) Plaintiffs contend that thereafter, Katz proceeded to pursue an acquisition of Friendship on his own. (ECF No. 21 at ¶ 91.) The Amended Complaint alleges that, in furtherance of Katz's acquisition of Friendship, Greenfield told Katz that he would not tell Green about Greenfield and Friendship's tentative deal with Katz; rather, Greenfield would instead tell Green that Greenfield was not comfortable with the promissory note. (ECF No. 21 at ¶ 101.) The Amended Complaint alleges that from the time Greenfield suggested to Katz that Katz purchase Friendship for himself and continuing until after this action was filed,

Greenfield and Friendship on the one hand, and Katz on the other, engaged in extensive negotiations for Katz, and Katz alone, to acquire Friendship in violation of his fiduciary duties to Plaintiffs. (ECF No. 21 at ¶¶ 90−94, 103−09, 122−25, 134, 137−44.)

95.    The Court concludes that, at the pleading stage, these allegations are sufficient to state an agreement between Defendants facilitating Katz's breach of fiduciary duty. *See Veer Right Mgmt. Grp., Inc.*, 2015 NCBC LEXIS 13, at \*9 ("This Court has allowed a conspiracy claim based on an agreement facilitating an underlying breach of fiduciary duty."); *see also Thomas & Howard Co. of Shelby, Inc. v. Am. Mut. Liability Ins. Co.*, 241 N.C. 109, 115, 84 S.E.2d 337, 341 (1954) ("The pleader must . . . allege the facts from which the alleged conspiracy may be inferred and the alleged unlawful acts agreed upon. However, the purpose of the complaint is to allege the substantive and constituent facts of the cause of action, not to narrate the evidencing supporting them."). Therefore, Greenfield and Friendship's Motion as to Plaintiffs' Fourteenth Claim for civil conspiracy is denied.

### 6.    UDTP (Fifteenth Claim)

96.    Plaintiffs assert a UDTP claim against Greenfield and Friendship based on Plaintiffs' claims for breach of the duty to negotiate in good faith, aiding and abetting a breach of fiduciary duty, aiding and abetting constructive fraud, and civil conspiracy, as well as AD&D's claims for misappropriation of trade secrets and conversion. (ECF No. 21 at ¶ 307.)

97. In order to state a UDTP claim, Plaintiffs must allege (1) an unfair or deceptive act or practice, (2) in or affecting commerce, (3) which proximately caused injury to Plaintiffs. *Belcher v. Fleetwood Enters., Inc.*, 162 N.C. App. 80, 85, 590 S.E.2d 15, 18 (2004). A breach of contract will only constitute an unfair or deceptive act or practice if a party shows substantial aggravating circumstances attending the breach. *Se. Shelter Corp.*, 154 N.C. App. at 330, 572 S.E.2d at 206. The internal conduct of individuals occurring within a single business is not in or affecting commerce so as to fall within the scope of N.C. Gen. Stat. § 75-1.1. *White v. Thompson*, 364 N.C. 47, 53, 691 S.E.2d 676, 680 (2010). Misappropriation of trade secrets may constitute a UDTP in violation of N.C. Gen. Stat. § 75-1.1. *E.g.*, *Ge Betz, Inc. v. Conrad*, 231 N.C. App. 214, 236, 752 S.E.2d 634, 650 (2013).

98. Greenfield and Friendship argue that "Plaintiffs' claim for [UDTP] should be dismissed because all the underlying claims used to support the existence of a[] [UDTP] are fatally defective[.]" (Mem. Supp. Defs. Greenfield & Friendship's Mot. Dismiss 23, ECF No. 36.) Greenfield and Friendship further argue that Plaintiffs' UDTP claim should be dismissed because "[t]he Amended Complaint does not show that Friendship and Greenfield did anything more than make a business decision about what risk it was willing to take with respect to a seller-financed note[.]" (ECF No. 36 at 23.)

99. As discussed above, the Court has concluded that the allegations of the Amended Complaint are sufficient to state the claims asserted therein, save and except for AD&D's Tenth Claim for conversion. As Greenfield and Friendship did not

argue or provide any other basis on which Plaintiffs' UDTP claim should be dismissed, the Court need not further consider the sufficiency of the factual allegations to support Plaintiffs' UDTP claim. Therefore, Greenfield and Friendship's Motion as to Plaintiffs' Fifteenth Claim for UDTP is denied.

## V. CONCLUSION

100. For the foregoing reasons, the Court **ORDERS** as follows:

A. The Court **DENIES** Katz's Motion.

B. The Court **GRANTS** Greenfield and Friendship's Motion as to AD&D's Tenth Claim for conversion and dismisses this claim with prejudice.

C. The Court **DENIES** Greenfield and Friendship's Motion as to all other claims.

**SO ORDERED**, this the 18th day of August, 2017.

/s/ Michael L. Robinson
Michael L. Robinson
Special Superior Court Judge
   for Complex Business Cases